UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

In re:

JULIA MARIE KEEBLER                         Case No.        04-34655
(f/k/a Julia Marie Dempsey),                Chapter 7
                                            Hon. Walter Shapero
        Debtor.
_____/

TIMOTHY D.P. DEMPSEY,

        Plaintiff,

v.                                          Adv. Proc. No.  05-3015

JULIA MARIE KEEBLER,

        Defendant.
_____/

OPINION REGARDING NON-DISCHARGEABILITY OF DEBTS
PURSUANT TO 11 U.S.C. §§ 523(a)(5) & (a)(15)

        In this adversary proceeding, Plaintiff seeks a determination that an obligation incurred

by Defendant, the debtor and his former spouse, as a result of their divorce is a nondischargeable

debt pursuant to 11 U.S.C. § 523(a)(5), or alternatively, under 11 U.S.C. § 523(a)(15).[1]  For the

reasons set forth below, the Court determines that debt is subject to discharge pursuant to Section

523(a)(5) but is a nondischargeable debt pursuant to Section 523(a)(15).  The following are the

Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy

Procedure 7052.

_____

        1.  The Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") does not apply
to this proceeding, which was commenced prior to its effective date.  *See* BAPCPA, Pub. L. No. 109-8,
§ 1501(B)(1), 119 Stat. 23 (codified as amended in scattered sections of 11 U.S.C.)  Citations that appear
in this opinion are to the Bankruptcy Code in effect pre-BAPCPA.

## I. Jurisdiction

This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334 and by the reference of the Eastern District Court of Michigan pursuant to Local District Court Rule 83.50(a)(1). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## II. Factual and Procedural Background

On November 4, 2004, Defendant filed a Chapter 7 bankruptcy petition. On February 7, 2005, Plaintiff, Mr. Dempsey (hereinafter referred to as "Mr. Dempsey"), timely filed the instant adversary proceeding seeking a determination that the debt of $13,944.95 owed to him by Defendant (hereinafter referred to as "Debtor") is not subject to discharge pursuant to 11 U.S.C. §§ 523(a)(5) and (a)(15). On February 24, 2005, Debtor filed an answer and affirmative defenses. A trial was completed on March 21, 2006 and the parties submitted post-hearing briefs.

### A.    *The Divorce Action*

After being married for seventeen years, Debtor commenced a divorce action[2] against Mr. Dempsey sometime in 2000. The parties have two children, who are now 16 and 21. Both parties were represented by counsel throughout their divorce proceeding. The parties, with the assistance of counsel, were able to reach an agreement as to the division of their assets and liabilities. Their agreement is contained in a "Consent Judgment of Divorce" (Judgment), which is signed by the parties and their attorneys. It was entered in their divorce proceeding on June 26, 2001.

Relevant to this proceeding, Debtor was awarded "all right, title and interest" in the parties' former marital home at 5369 Cross Village, Grand Blanc, Michigan 48439, subject to certain conditions, including a requirement that she "assume and pay any and all indebtedness thereon including mortgage payments due and owing July 1, 2001, or thereafter." ("Consent Judgment of Divorce," Plf.'s Ex. A at 14.) In addition, Debtor was required to be "solely

---

2. In the divorce action, Debtor, Mrs. Keebler, was the Plaintiff and Plaintiff, Mr. Dempsey, was the Defendant.

responsible for the consolidation loan against the marital home, approximately $11,000.00, and the second mortgage against the marital home (namely the debt to David and Margaret Cuvrell approximating $30,000) from July 1, 2001 forward." (*Id.*). Mr. Dempsey was responsible "for all mortgage payments in arrears, property taxes, and property taxes in arrears due and owing prior to July 1, 2001, saving the [Debtor] harmless therefrom." (*Id.*) He was required "to make these amounts current by July 26, 2001." (*Id.*) Debtor was required to pay Mr. Dempsey his interest in the equity in the marital home in a lump sum amount of "$24,500 plus six percent simple interest, per year . . . when the marital [home was] sold or when she remarrie[d] or within thirty days of the youngest child's high school graduation date, but in no case any later than the youngest child reaching the age of nineteen and one-half (19 ½)." (*Id.*)

A short time after the parties' divorce, Debtor married Donald Keebler, which triggered her obligation to pay Mr. Dempsey his interest in the marital home. In June 2002, the marital home was sold. (Def.'s Ex. 16.) The parties' stipulated that "there was no equity from the sale of the marital home and $2,258.54 had to be paid to close the sale of the home." (Joint final pre-trial order at 6.) A dispute then arose between the parties as to the amount of monies they owed one another. When Debtor failed to pay Mr. Dempsey, he sought post-judgment relief in state court. On January 9, 2004, the state court issued an opinion and order, which specifies that:

> [Mr. Dempsey] is to receive a money judgment against [Debtor] of $24,500.00 less the following setoffs: $1,140.81, The Charter One mortgage[;] $5,724.22 State of Michigan tax lien[;] $2,158.00, life insurance proceeds[;] $645.71, unpaid medical bills of the children[;] $328.68, spousal support[;] and $557.63 child support. Accordingly, [Mr. Dempsey] is awarded a money judgment against [Debtor] in the amount of $13,944.95.[3]

(Opinion and Order of the Circuit Court for Genesee County, Michigan, Plf.'s Ex. B.) Neither party filed an appeal from this opinion and order.

---

3. In her post-hearing brief, Debtor maintains that this Court should reduce the amount of the money judgment by $10,000 in order to correct a mathematical error she alleges exists in Judge Farah's opinion and order. The Court rejects this position for two reasons. First, there is no mathematical error; Debtor has misinterpreted the language of the opinion and order. Second, even if the Court agreed with Debtor and an error existed, this Court pursuant to the *Rooker-Feldman* doctrine lacks the authority to modify a state court judgment. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); and *McCormick v. Braverman*, 451 F.3d 382 (6th Cir. 2006).

B.       *Plaintiff, Timothy D.P. Dempsey's Circumstances*

Mr. Dempsey, age 50, is single and lives with his father, who is 81 years old, in an apartment in Grand Blanc, Michigan.  While he helps care for his father, he does not buy any groceries or pay any expenses associated with the apartment.  He is a high school graduate, earned an associates degree from Mott College, and attended a few classes at U of M Flint but did not earn a degree.

Mr. Dempsey currently acts as a caretaker for his two terminally ill nephews, Louis, age 31 and William, age 33.  He began caring for them around the same time of his divorce in 2001. He receives net monthly compensation from the State of Michigan of $430.00 or $5,160.00 yearly.  His responsibilities include meeting their personal care needs, cleaning the house, and doing laundry.  When he initially began providing such care to his nephews, he received more compensation because it came through Genesee County Mental Health but that source is no longer available.  He has no other earned income.

C.       *Debtor, Julia M. Keebler's Circumstances*

Debtor, age 48, is married and resides with her husband, Donald Keebler, age 52, and youngest daughter, Ashley, age 16, in Grand Blanc, Michigan.  Although Debtor's oldest daughter, Natalie, lived with them at the time she filed her bankruptcy petition, she no longer lives at home.  Debtor and her husband are both high school graduates. Debtor has one year of post-secondary education.  Mr. Keebler has been employed for 28 years at GM Powertrain in Ypsilanti, Michigan.

Debtor's currently earns money from "odd jobs" involving the personal care of an elderly man, cleaning houses, and providing manicures and pedicures at a senior citizens' home.  The personal care services she provides twice a week earns her $100 for both days, so about $400 a month; for cleaning her girlfriend's house she earns $40 one week and $60 the other week totaling approximately $200 a month.  Every other Friday Debtor works at Amerihouse providing pedicures to senior citizens, the income from which varies but is estimated at $40 every other week.  Since her divorce, Debtor has not had any other jobs.  She has been cleaning homes for about 10 years and has been providing nail services for two years.  She is a certified manicurist.   Her only other income consists of monthly child support from Mr. Dempsey.

III.   Issue

-4-

The issue involved in this proceeding is whether to except from discharge pursuant to 11 U.S.C. §§ 523(a)(5) or 523(a)(15), Debtor's obligation pay Mr. Dempsey $13,944.95, exclusive of interest (the Debt), arising out of their divorce Judgment.

## IV. <u>Arguments of the Parties</u>

Initially, Mr. Dempsey maintains that the Debt is in the nature of support and is a nondischargeable debt under § 523(a)(5), arguing that the Judgment specifically characterizes the Debt as spousal support. In support of his position, Mr. Dempsey primarily relies on *Sorah v. Sorah*, (*In re Sorah*), 163 F.3d 397 (6th Cir. 1998). Alternatively, he contends that the Debt is not subject to discharge pursuant to 11 U.S.C. § 523(a)(15).

Debtor challenges Mr. Dempsey's interpretation of their Judgment by arguing that the Debt is actually a dischargeable property settlement. Debtor contends that the Debt falls within the category of debts covered by 11 U.S.C. § 523(a)(15) and is dischargeable under either of the exceptions stated in § 523(a)(15)(A) or (B).

## V. <u>Discussion</u>

A. <u>*11 U.S.C. § 523(a)(5)*</u>

Section 523(a) provides that

a discharge under section 727 . . . of this title does not discharge an individual debtor from any debt —
. . . .

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child in connection with a . . . divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a government unit, or property settlement agreement, but not to the extent that—
. . . .

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[.]

11 U.S.C. § 523(a)(5)(B).

Federal bankruptcy law, not state law, controls the determination of the dischargeability of a debt that is "in the nature of" support. *Long v. Calhoun* (*In re Calhoun*), 715 F.2d 1103 (6th Cir. 1983) and *Singer v. Singer* (*In re Singer*), 787 F.2d 1033, 1035-36 (6th Cir. 1986). But as part of its analysis, a bankruptcy court may to a certain extent be guided by state law principles of domestic relations. *In re Calhoun*, 715 F.2d at 1107-08; *In re Singer* 787 F.2d at 1035. A non-debtor spouse bears the burden of proving that a § 523(a)(5) debt is nondischargeable. *In re Calhoun*, 715 F.2d at 1111 n.15.

The Sixth Circuit Court of Appeals has developed two tests to determine if a "liability is actually in the nature of alimony, maintenance, or support." *Jestice v. Jestice* (*In re Jestice*), 2006 Fed.App. 0105N, 168 Fed. Appx. 39, *43 n.1 (6th Cir.).[4] The distinction between these tests involves whether an obligation in a divorce decree or property settlement agreement is or is not designated as alimony, maintenance, or support. *Id. See also Fitzgerald v. Fitzgerald* (*In re Fitzgerald*), 9 F.3d 517, 520-22 (6th Cir. 1993) (pointing out that the four step analysis announced in *Calhoun* applies "when determining whether an obligation, which was not designated alimony or maintenance, was nonetheless actually in the nature of support and nondischargeable.")

In *Long v. Calhoun* (*In re Calhoun*), 715 F.2d 1103 (6th Cir. 1983),[5] the Sixth Circuit established the following four prong analytical framework to be applied when a debt is not designated or labeled as alimony, maintenance, or support:

    1. whether the state court or the parties to the divorce intended to create

---

4. Although the Court is not bound by unpublished decisions of the Sixth Circuit Court of Appeals, such decisions "may be cited by the Court if persuasive and no published decisions serve as well." *Gibson v. Gibson*, (*In re Gibson*), 219 B.R. 195, 201 (B.A.P. 6th Cir. 1998) (citing *Belfance v. Black River Petroleum* (*In re Hess*), 209 B.R. 79, 82 n.3 (B.A.P. 6th Cir. 1997)).

5. Even though the obligations at issue in *Calhoun* involved debts that had been assumed by a party in a separation agreement, the test it established is not to be limited to these facts. *Singer v. Singer* (*In re Singer*), 787 F.2d 1033, 1038 n.2 (6th Cir. 1986) (recognizing that *Calhoun* has "general applicability" to all support cases under 11 U.S.C. § 523(a)(5)). *But see also Sorah v. Sorah*, (*In re Sorah*), 163 F.3d 397, 401 (6th Cir. 1998) (recognizing the uncertainty of *Calhoun's* analysis as to third-party debt assumptions due to the 1994 amendments to Section 523(a)(15), which created two exceptions to the presumption of the nondischargeability of divorce-related debts).

an obligation to provide support. . . .  If they did not, the inquiry ends.

2.  in the event a bankruptcy court determines that the parties intended to create an obligation in the nature of support, then it must next inquire whether the support provision has the actual effect of providing necessary support;

3.  whether the amount of support is so excessive as to be unreasonable under traditional concepts of support; and

4.  if the amount of support is unreasonable, how much of it should be characterized as nondischargeable for purposes of federal bankruptcy law.

*In re Singer*, 787 F.2d at 1036 (*citing Calhoun*, 715 F.2d at 1109) (Guy, J., concurring).

Conversely, *Sorah v. Sorah* (*In re Sorah*), 163 F.3d 397 (6th Cir. 1998) sets forth the analytical framework for a debt that is specifically labeled as alimony, maintenance, or support. Under this test,

[a bankruptcy] court should look to the traditional state law indicia that are consistent with a support obligation. These include, but are not necessarily limited to, (1) a label such as alimony, support, or maintenance in the decree or agreement, (2) a direct payment to the former spouse, as opposed to the assumption of a third-party debt, and (3) payments that are contingent upon such events as death, remarriage, or eligibility for Social Security benefits.

An award that is designated as support by the state court and that has the above indicia of a support obligation (along with any others that the state support statute considers) should be conclusively presumed to be a support obligation by the bankruptcy court. A non-debtor spouse who demonstrates that these indicia are present has satisfied his or her burden of proving that the obligation constitutes support within the meaning of § 523, and is thus nondischargeable. . . . The burden then shifts to the debtor spouse to demonstrate that although the obligation is of the *type* that may not be discharged in bankruptcy, its *amount* is unreasonable in light of the debtor spouse's financial circumstances.

*In re Sorah* 163 F.3d 397, 401 (6th Cir. 1998) (emphasis in original).

The Debt at issue in this proceeding is referred to in two provisions of the parties' Judgment.  First, the "JOINTLY OWNED REAL ESTATE" provision states:

-7-

IT IS FURTHER ORDERED that all right, title and interest which the parties hereto may have in and to the premises commonly known as 5369 Cross Village, Grand Blanc, Michigan 48439, . . . shall vest in the [Debtor] . . . and [Debtor] shall assume and pay any and all indebtedness thereon including mortgage payments due and owing July 1, 2001, or thereafter. [Debtor] . . . shall also be solely responsible for the consolidation loan against the marital home, approximating $11,000.00, and the second mortgage against the marital home (namely the debt to David and Margaret Cuvrell approximating $30,000.00) from July 1, 2001, onward.  [Mr. Dempsey] . . . shall be responsible for all mortgage payments in arrears, property taxes, and property taxes in arrears due and owing prior to July 1, 2001, saving the [Debtor] harmless therefrom. [Mr. Dempsey] shall make these amounts current by July 26, 2001.  Upon receipt of *payment of [Mr. Dempsey's] equity in the marital home*, [he] shall execute a quit claim deed conveying his interest in the marital home to the [Debtor].  The *payment of equity* from [Debtor] to [Mr. Dempsey] in the amount of $24,500.00 plus six percent simple interest, per year, shall be made in full when the marital household is sold or when she remarries or within thirty days of the youngest child's high school graduation date, but in no case any later than the youngest child reaching the age of nineteen and one-half (19 ½).

(Plf.'s Ex. A at 14.) (emphasis added).

The next page of the Judgment contains the "CASH PAYMENT" provision, which states:

IT IS UNDERSTOOD BETWEEN THE PARTIES AND ORDERED BY THIS COURT that [Mr. Dempsey] shall be compensated for *his equity in the marital property* by a $24,500.00 cash payment from the [Debtor] to [him].  This payment shall be made in full within thirty days of the youngest child's current high school graduation date (absolutely no later than age nineteen and one-half (19 ½)) or upon [Debtor's] remarriage or upon refinancing or sale of the home, whichever event arises sooner.  Six percent simple interest per year will accrue on this amount, beginning with the date of entry of this Judgment.

(Plf.'s Ex. A at 15.) (emphasis added).

Based on these two provisions, Debtor was awarded the parties' former marital home and this award was subject to her assuming and being solely responsible for (1) mortgage payments due from July 1, 2001 forward; (2) the consolidation loan of approximately $11,000; and (3) the second mortgage to David and Margaret Cuvrell of roughly $30,000.  Debtor was also required to make a "cash payment" of $24,500 plus any accrued interest to Mr. Dempsey for "his equity" in the marital home upon the occurrence of certain conditions.  For his part, Mr. Dempsey was required to cure any arrearages that existed prior to July 1, 2001, in all mortgage payments and

property taxes no later than July 26, 2001. He assumed and agreed to hold Debtor harmless on these debts that were in arrears. When Mr. Dempsey received the equity payment from Debtor, he was to execute a quit claim deed conveying his interest in their former marital home to her. These provisions on their face do not label or designate the Debt as alimony or spousal support. The express language of both of these provisions specifically designate the Debt as Mr. Dempsey's portion of the "equity in the martial home."

Even so, Mr. Dempsey contends that the "JOINTLY OWNED REAL ESTATE" and "CASH PAYMENT" provisions must be read in light of the "ANTI-BANKRUPTCY CLAUSE" provision, which provides:

> IT IS FURTHER ORDERED that the assumption of marital debts as outlined herein is acknowledged as an obligation of spousal support, maintenance and alimony. The parties specifically and intentionally characterize the assumption of debt as spousal support for the purpose of meeting any definition of support, alimony, or maintenance under 11 U[.]S[.]C[.] [§] 523(a)(5), so that neither [Mr. Dempsey] nor [Debtor] have the debt discharged in bankruptcy. Both parties are aware that [Mr. Dempsey] currently has the intention of filing bankruptcy but [Mr. Dempsey] warrants that he has no intention of and can not discharge any debt to the other party as outlined in this Consent Judgment. In the event a court determines that the agreement to characterize the assumption of marital debts as spousal support is not valid, then the parties agree that the assumption of such debts are excepted from discharge pursuant to 11 U[.]S[.]C[.] [§] 523(a)(15). At the time of entry of this Judgement [sic], [Debtor] and [Mr. Dempsey] agree they have the ability to pay the debts from income presently available. The parties agree that any construction of the phrase in 11 U[.]S[.]C[.] [§] 523(a)(5) "reasonably to be expended in support of the debtor or dependents of the debtor"[6] shall be made is [sic] a usual and customary manner.

(Pl.'s Ex. A at 16-17.)

Mr. Dempsey maintains that the "ANTI-BANKRUPTCY CLAUSE" provision characterizes the Debt as spousal support because the parties agreed "that marital debt such as the obligation[]

---

6. This phrase does not appear in 11 U.S.C. § 523(a)(5). It appears the reference to § 523(a)(5) may be a typographical error since the two sentences before the final sentence of this paragraph relate to the "ability to pay" requirement of 11 U.S.C. § 523(a)(15)(A), which contains the phrase "not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 523(a)(15)(A).

owed on the marital home was spousal support." (Plf.'s Trial Br. at 6.) As additional support for his position, Mr. Dempsey offered the testimony of his divorce attorney, Ms. Julia Black. She has been practicing domestic relations law for 13 years and has handled thousands of cases throughout the State of Michigan. In her view, the Debt is governed by the "ANTI-BANKRUPTCY CLAUSE." Ms. Black testified that during the parties' negotiations, a concern was raised about the possibility that Mr. Dempsey would file bankruptcy due to the large sums of marital debt he agreed to assume and hold Debtor harmless on. She stated that although Mr. Dempsey indicated that he would not file bankruptcy, the parties' reached an agreement that in the event either of them filed bankruptcy the debts assumed by them would be characterized as spousal support. According to Ms. Black, the Debt is a marital debt that Debtor assumed since she was obligated to pay Mr. Dempsey his share of the equity in the marital home.

Based on this premise, Mr. Dempsey argues that the Debt fulfills all the factors of *Sorah* to enable the Court to find that the Debt is a nondischargeable debt under § 523(a)(5). He points out that (1) based on the "ANTI-BANKRUPTCY CLAUSE" provision the Debt is "specifically designated" as spousal support; (2) he was to receive a payment directly from Debtor; and (3) payment of the Debt was contingent upon the marital home being sold, Debtor's remarriage, or within 30 days of their youngest child's graduation from high school but no later than when she turns 19 ½ .

The Court rejects Mr. Dempsey's argument for two reasons. First, the "ANTI-BANKRUPTCY CLAUSE" provision on its face does not apply to the Debt at issue. The express language of the "ANTI-BANKRUPTCY CLAUSE" indicates that it applies to any marital debts *assumed* by either party as "outlined" in their Judgment. The Debt at issue is *not* one of these assumed debts. A review of the Judgment indicates that the "JOINTLY OWNED REAL ESTATE" and "DEBTS" provisions specify the marital debts assumed by the Debtor and Mr. Dempsey. As previously stated, under the "JOINTLY OWNED REAL ESTATE" provision, Debtor assumed responsibility of and agreed to hold Mr. Dempsey harmless on (1) the mortgage payments due and owing as of July 1, 2001; (2) an $11,000 consolidation loan; and (3) the second mortgage to the David and Margaret Cuvrell of some $30,000. This provision also states that Mr. Dempsey assumed and agreed to hold Debtor harmless on any mortgage payments and

-10-

property taxes in arrears prior to July 1, 2001. In addition, the "DEBTS" provision of the Judgment indicates that Mr. Dempsey was

> solely responsible for all debts in his name as of June 26, 2001, including, but not limited to: The Bank One Line of Credit, the personal loan from David Cuvrell approximating $4600.00; the estimated taxes payable to the IRS and to the State of Michigan; the loan payable to Dempsey Micrographics; the NBD Visa; the Citizens Bank Visa; the GMAC automobile loan; and the NBD loan in his name. If a creditor of the above-specified debts pursues collection against [Debtor], [Mr. Dempsey] shall hold the [Debtor] free and clear of any collection and agrees to hold [Debtor] harmless from the same.

(Plf.'s Ex. A at 15-16.)

These various debts assumed by the Debtor and Mr. Dempsey are typical of an assumption of debt agreement. *In re Calhoun*, 715 F.2d 1103, 1106 (6th Cir. 1983) ("There are two distinct obligations involved in an agreement to assume former joint marital debt [1] the underlying debt owed to the mutual creditor and [2] the obligation owed directly to the former spouse to hold the spouse harmless on that underlying debt."). But, it is undisputed that none of these assumed debts are at issue in this proceeding. The debts assumed by Debtor were paid in full at the closing of the marital home. *See* Def.'s Ex. 16. As far as Mr. Dempsey's obligation to assume and hold Debtor harmless on any mortgage or property taxes in arrears prior to July 1, 2001 relative to the marital home, this issue appears to have been encompassed in the post-judgment dispute addressed and resolved by the state court's opinion and order. *See* Plf.'s Ex. B. And, the remaining debts assumed by Mr. Dempsey under the "DEBTS" provision are still unpaid. Thus, in the event Mr. Dempsey filed bankruptcy and if the terms of the "ANTI-BANKRUPTCY CLAUSE" were enforced, all of the debts he assumed would be rendered nondischargeable.

Second, Mr. Dempsey's reliance on *Sorah* is misplaced. *In re Sorah* applies when an obligation is specifically labeled or designated as one of "support, maintenance, or alimony in the divorce decree or agreement." *In re Jestice*, 2006 Fed.App. 0105N, 168 Fed. Appx. 39, *43 n.1 (6th Cir.). "*Sorah* reaffirmed the requirement that bankruptcy courts defer to state courts' decisions if awards appear to be in the nature of support. Stated differently, if an obligation is designated as support and has the indicia, the intent to create a support award is conclusively

presumed and a bankruptcy court is not to challenge that intent by probing the award." *Andrus v. Ajemian* (*In re Andrus*), 338 B.R. 746, 753 (Bankr. E.D. Mich. 2006) (citations omitted). However, in this proceeding and contrary to Mr. Dempsey's argument, the Debt was not specifically designated or referred to as a support obligation in the Judgment. Nonetheless, the Court is required to determine whether the Debt is in the nature of support. *Goans v. Goans* (*In re Goans*), 271 B.R. 528, 533 (Bankr. E.D. Mich. 2001) (explaining that "if the state court has not specifically labeled an obligation as support, the bankruptcy court 'must look behind the award that is made under state law and make an independent factual inquiry to determine whether the award is actually in the nature of support.'"); *See also Smith v. Smith* (*In re Smith*), 131 B.R. 959, 962 (Bankr. E.D. Mich. 1991) (stating that the language of Section 523(a)(5) requires a bankruptcy court to determine whether an award provided by a judgment of divorce is "true alimony, maintenance, or support which would be nondischargeable in bankruptcy").

Since the Debt is not labeled as support in the parties' Judgment, pursuant to Sixth Circuit precedent, the Court's analysis is controlled by the test established in *Calhoun*. The first prong under *Calhoun* requires the Court to determine "whether the state court or the parties to the divorce intended to create an obligation to provide support. . . . If they did not, the inquiry ends." *In re Singer*, 787 F.2d at 1036 (*citing Calhoun*, 715 F.2d at 1109) (Guy, J., concurring)). "The question of intent is not only relevant under *Calhoun*, it constitutes a "threshold criterion." *In re Smith*, 131 B.R. 959, 962 (Bankr. E.D. Mich. 1991). Both parties must have intended for an obligation to provide support. *Id.* (*citing Larson v. Boroff*, 892 F.2d 1043 (6th Cir. 1990) (an unpublished decision)).

Under this prong, "the bankruptcy court may consider any relevant evidence including those factors utilized by state courts to make a factual determination of intent to create support." *In re Calhoun*, 715 F.2d 1103, 1109 (6th Cir. 1983). Such factors utilized by state courts could include:

> the nature of the obligation; the structure and language of the parties' agreement or the court's decree; whether other lump sum or periodic payments were also provided; length of the marriage; the existence of children from the marriage; relative earning powers of the parties; age, health and work skills of the parties; the adequacy of support; and evidence of negotiation and other understandings as

to the intended purpose of the obligation.

*In re Calhoun,* 715 F.2d at 1108 n.7.

Even when the Court engages in the analysis as required by *Calhoun,* the evidence in the record fails to demonstrate that the parties' intended for the Debt to be in the nature of spousal support. It is not necessary for the Court to consider all of the factors permitted under the first prong of *Calhoun.* The Court determines that three factors: (1) the nature of the obligation; (2) the structure and language of the parties' Judgment; and (3) the evidence in the record about the parties' understandings about the Debt overwhelmingly indicate that the Debt is not only in the form of a property settlement, but it is and was intended to be such.

First, the nature of the obligation: Debtor was awarded the parties' former marital home and she was required to compensate Mr. Dempsey for his interest in the equity in the marital home by a lump sum payment upon the occurrence of certain conditions. This suggests a division of a marital asset; i.e., a property settlement.

Second, there is the structure and language of the parties' agreement: The Judgment does contain an "ALIMONY" provision, which states that "[Mr. Dempsey] shall pay alimony to the [Debtor] in the amount of $45.00 per week commencing July 1, 2001, and ending June 30, 2002. This amount or the length of its term is non-modifiable, unless [Debtor] dies prior to June 30, 2002." (Plf.'s Ex. A at 16.) Beyond this "ALIMONY" provision, the Judgment is devoid of any similar or identical provision requiring Debtor to pay alimony or spousal support to Mr. Dempsey. The plain language of the mutually consented to Judgment is devoid of any provision that awards or reserves alimony, support, or maintenance to Mr. Dempsey. This is strong evidence that the parties intended to preclude him from receiving alimony or support payments from the Debtor. *In re Smith,* 131 B.R. at 963 (*citing Griffith v. Comm'r,* 749 F.2d 11, 13 (6th Cir. 1984) ("The language and structure of the [divorce] decree are of great weight in determining whether the decree was intended to require payments as support or property settlements.")).

Finally, the evidence of the negotiations that occurred between the parties at the time of their divorce. The record is devoid of any persuasive evidence that either party intended the Debt to be in the nature of support. Debtor testified that it was her understanding that the

-13-

"JOINTLY OWNED REAL ESTATE" provision, simply required her to pay Mr. Dempsey his share of the equity in the martial home.  She also testified with regard to the "ANTI-BANKRUPTCY CLAUSE," that she could not recall whose idea it was to insert such a provision in to the Judgment.  She explained that she believed it was inserted for her protection because Mr. Dempsey had threatened to file bankruptcy.  Mr. Dempsey testified that Debtor was awarded spousal support and that he was not awarded any.  He further testified that he did not think he had any discussions with his attorney, Ms. Julia Black, about his eligibility to receive spousal support.  Mr. Dempsey also testified that the "ANTI-BANKRUPTCY CLAUSE" was inserted in the Judgment at Debtor's request because he had at one time threatened to file bankruptcy.

Based on this evidence, the Court finds that there was no intention by Mr. Dempsey and the Debtor for the Debt to be in the nature of support and finds that the Debt is actually in the form of a property settlement.[7]  The Court concludes that Mr. Dempsey failed to meet his burden of proof of establishing that the Debt satisfies the requirements of § 523(a)(5)(B).  The Court will next consider whether the Debt may be excepted from discharge pursuant to § 523(a)(15).

B.    11 U.S.C. § 523(a)(15)


Section 523(a) states that a discharge awarded

under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

. . . .

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless–

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the

---

7.  This finding renders it unnecessary for the Court to consider Debtor's argument that the "ANTI-BANKRUPTCY CLAUSE" is void and against public policy because it amounts to a pre-petition waiver of the discharge.

-14-

debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

> (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor[.]

11 U.S.C. § 523(a)(15).

"Under § 523(a)(15), a debtor is not discharged from any marital debt that is not in the nature of alimony, maintenance, or support unless (1) the debtor is unable to pay the debt, or (2) the benefit to the debtor would outweigh the detriment to the debtor's former spouse." *Patterson v. Patterson*, (*In re Patterson*), 132 F.3d 33, 1997 WL 745501 at *2 (6th Cir. November 24, 1997).[8]

The standard of proof in a § 523(a)(15) proceeding is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Initially, a plaintiff is required to prove that (1) a debt was incurred, (2) in connection with a divorce or separation, and (3) the debt is "not of the kind" described in 11 U.S.C. § 523(a)(5). Once a plaintiff meets this burden, the burden shifts to the debtor to come forward with evidence to establish either of the exceptions expressly provided under § 523(a)(15)(A) or (B). *Id.* (citing in support of its holding *In re Jodoin*, 209 B.R. 132, 140 (B.A.P. 9th Cir. 1997) and *In re Moeder*, 220 B.R. 52, 56 (B.A.P. 8th Cir. 1998)); *See also Gamble v. Gamble*, 143 F.3d 223, 226 (5th Cir. 1998).

As a result of the Court's determination that the Debt is "not of the kind" described in 11 U.S.C. § 523(a)(5), Mr. Dempsey's initial burden is met. *See Crosswhite v. Ginter*, 148 F.3d 879, 884-85 (7th Cir. 1998) (concluding that a creditor bears the initial burden of proof under § 523(a)(15)). The burden now shifts to the Debtor to establish either one of the exceptions contained in § 523(a)(15)(A) and (B).

1.  <u>Debtor failed to establish that she does not have the ability to pay the Debt to Mr. Dempsey</u>

---

8. Although the Court is not bound by unpublished decisions of the Sixth Circuit Court of Appeals, such decisions "may be cited by the Court if persuasive and no published decisions serve as well." *Gibson v. Gibson*, (*In re Gibson*), 219 B.R. 195, 201 (B.A.P. 6th Cir. 1998) (citing *Belfance v. Black River Petroleum* (*In re Hess*), 209 B.R. 79, 82 n.3 (B.A.P. 6th Cir. 1997)).

Section 523(a)(15)(A) requires that a debtor prove that he "does not have the ability to pay such debt."  But the phrase "ability to pay" is not defined under the Code.  Although some ambiguities and confusion exist in the case law,[9] the majority of courts define "ability to pay" by relying on the "disposable income test" under 11 U.S.C. § 1325(b)(2).  *Hammermeister v. Hammermeister* (*In re Hammermeister*), 270 B.R. 863, 877 (Bankr. S.D. Ohio 2001) (citing *Pino v. Pino* (*In re Pino*), 268 B.R. 483, 497 (Bankr.W.D.Tex.2001) ("[M]ost courts rely on the 'disposable income test' of § 1325(b)(2) of the Bankruptcy Code because that section's language essentially mirrors the language [of] § 523(a)(15)(A).")(other citations omitted).  When applying 'the disposable income test,' courts often measure the amount of a debtor's income and reasonably necessary expenses as of the date of the trial.  *Bubp v. Romer*, (*In re Romer*), 254 B.R. 207, 212 (Bankr. N.D. Ohio 2000) (*citing Miller v. Miller* (*In re Miller*), 247 B.R. 412, 415 (Bankr. N.D. Ohio 2000)); *Crawford v. Osborne* (*In re Osborne*), 262 B.R. 435, 443 (Bankr. E.D. Tenn. 2001) (recognizing that a debtor's disposable income is considered as of the date of trial); *Crossett v. Windom* (*In re Windom*), 207 B.R. 1017, 1021 (Bankr. W.D. Tenn. 1997) (explaining that disposable income is measured at the time of trial); *but see Dunn v. Dunn*, (*In re Dunn*), 225 B.R. 393, 399 (Bankr. S.D. Ohio 1998) (explaining that date the bankruptcy petition is filed controls a court's determination under Section 523(a)(15)).

In addition, courts then consider several other factors associated with a debtor's financial situation in order to obtain a more thorough assessment of a debtor's ability to pay.  These factors include:

> (1) [the] presence of more lucrative employment opportunities which might
> enable the debtor to fully satisfy [her] divorce-related obligation; (2) the extent to
> which the debtor's burden of debt will be lessened in the near term; (3) the extent
> to which the debtor previously has made a good faith effort towards satisfying the
> debt in question; (4) the amount of the debts which a creditor is seeking to have
> held nondischargeable and the repayment terms and conditions of those debts; (5)
> the value and nature of any property the debtor retained after [her] bankruptcy
> filing; (6) the income of the debtor's new spouse as such income should be

---

9. *See Humiston v. Huddelston*, (*In re Huddelston*), 194 B.R. 681, 686 (Bankr. N.D. Ga. 1996) (This case provides a thorough discussion on the difficulties courts have experienced in defining the "ability to pay" standard of 11 U.S.C. § 523(a)(15)(A).).

included in the calculation of the debtor's disposable income; and (7) any
evidence of probable changes in a debtor's expenses.

*In re Hammermeister*, 270 B.R. 863, 878 (Bankr. S.D. Ohio 2001) (citing *Armstrong v.*
*Armstrong* (*In re Armstrong*), 205 B.R. 386, 392 (Bankr.W.D.Tenn.1996)).

In consideration of the factor involving a debtor's future earning potential, in *Hart v.*
*Molino* (*In re Molino*), 225 B.R. 904 (B.A.P. 6th Cir. 1998), the Bankruptcy Appellate Panel
indicated that "a court may look to a debtor's prior employment, future employment
opportunities, and health status to determine" the prospective earnings of a debtor. *In re Molino*,
225 B.R. at 908 (citing *Florio v. Florio*, (*In re Florio*), 187 B.R. 654, 657-58 (Bankr. W.D. Mo.
1995)).

A debt will be discharged under § 523(a)(15)(A) "only if repaying it reduces a debtor's
current income below the level reasonably needed for the support of the debtor or his or her
dependents." *In re Hammermeister*, 270 B.R. at 877 (*citing Carroll v. Carroll* (*In re Carroll*),
187 B.R. 197, 200 (Bankr. S.D. Ohio 1995)).

Although the express language of § 523(a)(15)(A) refers to a debtor's ability to pay from
"income or property of the debtor," courts in a number of jurisdictions have determined that
when a debtor remarries, like in the instant proceeding, it is appropriate to include the new
spouse's income in the disposable income calculation. *Beiderman v. Stoodt*, (*In re Stoodt*), 302
B.R. 549, 556 (Bankr. N.D. Ohio 2003) (explaining that the income and expenses of a debtor's
spouse are properly considered in the disposable income analysis when "they are sufficiently
intertwined with the debtor's income and expenses so as to make segregating the figures both
impractical and unfair."); *Butler v. Butler* (*In re Butler*), 277 B.R. 843, 852 (Bankr. M.D. Ga.
2002) (pointing out that the financial circumstances of a debtor's new spouse or live-in
companion are considered by most courts in § 523(a)(15)(A) proceedings.); *Beasley v. Adams*,
200 B.R. 630, 633 (Bankr. N.D. Ill. 1996) (finding no error of law by bankruptcy court having
considered new wife's income as part of its ability to pay § 523(a)(15)(A) determination);
*Cleveland v. Cleveland*, (*In re Cleveland*), 198 B.R. 394, 399 (Bankr. N.D. Ga. 1996)
(application of the "ability to pay" standard of § 523(a)(15)(A) must include the income of a new

spouse in order for bankruptcy court to properly complete its analysis); *but see Willey v. Willey* (*In re Willey*), 198 B.R. 1007, 1014-15 (Bankr. S.D. Fla. 1996) (refusing to consider debtor's live-in companion's income under § 523(a)(15)(A) and (B)). "The determination regarding the inclusion of such income is fact-driven, and is left to the sound discretion of the trial judge," *Miller v. Miller*, (*In re Miller*), 2002 WL 31957422 (W.D. Ky. 2002).

With all of these principles in mind, the Court will first review Debtor's income and expenses to determine whether she can afford to pay those reasonably necessary expenses in addition to the Debt. *In re Mannix*, 303 B.R. at 596 (recognizing that "[s]ubsection 523(a)(15)(A) or the 'ability to pay' test, forces the court to 'engage in the unenviable task of scrutinizing'" debtors' income and expense schedules) (citations omitted). With regard to the Debtor's income, due to the substantial commingling of the income and expenses of Debtor and her husband, the Court determines that it is appropriate to include her husband's income for purposes of calculating her ability to pay the Debt. Specifically, Debtor testified that she had no separate expenses, that their expenses are combined, and that she only had an interest in savings and checking accounts held jointly with her spouse. It is apparent to the Court that Debtor's standard of living is subsidized to a large degree by her husband.

In her Schedule I, Debtor indicates her monthly income as $282.75 in child support and $433.33 from cleaning houses and providing nail care services. Her total monthly income is stated as $716.08. In addition, Debtor's Schedule I indicates her husband's gross monthly income as $4,532.67 and net monthly income as $3,331.30. Their total combined monthly income equaled $4,047.38. At trial, Debtor presented a statement about their current income. This exhibit indicates that Debtor's net monthly income of $932.75 consists of $282.75 in child support and $650.00 for cleaning and nail services. Debtor's husband's gross income is represented to be $5,200.00 and net monthly income as $3,778.66. Their combined net monthly income equals $4,711.41. During the trial however, Debtor acknowledged that Mr. Dempsey had received a recent reduction in child support of $22.00 so the amount of child support is actually $260.75. This change would reduce the combined net monthly income to $4,689.41.

With regard to her expenses, Debtor's Schedule J indicates monthly expenses totaling $4,350.37. At the time of trial, Debtor presented a statement of her current expenses, which

-18-

indicates total expenses of $5,461.22.  The table listed below provides a comparison of the Debtor's expenses as of the date she filed her bankruptcy petition and at the time of trial.

| | Filing | Trial | Change (+/-) | |
|---|---|---|---|---|
| Mortgage | $   950.31 | $   950.31 | $       0.00 | |
| Home Equity Loan | 0.00 | 300.00 | 300.00 | |
| Electricity/Gas | 219.00 | 477.50 | 258.50 | |
| Water | 63.00 | 75.00 | 12.00 | |
| Telephone | 173.81 | 150.81[10] | -23.00 | |
| Cable | 94.19 | 98.44 | 4.25 | |
| Home repairs | 100.00 | 100.00 | 0.00 | |
| Food | 800.00 | 675.00 | -125.00 | |
| Clothing | 200.00 | 200.00 | 0.00 | |
| Laundry/Dry Cleaning | 20.00 | 45.00 | 25.00 | |
| Medical/Dental | 30.00 | 66.38 | 36.38 | |
| Transportation | 250.00 | 460.00 | 210.00 | |
| Recreation, etc. | 100.00 | 100.00 | 0.00 | |
| Charitable contribution | 4.33 | 4.33 | 0.00 | |
| Homeowner's insurance | 80.00 | 101.50 | 21.50 | |
| Life insurance | | 40.00 | 105.00 | 65.00 |
| Auto insurance | 224.00 | 446.21[11] | 222.21 | |
| Property taxes | | 300.25 | 310.92 | 10.67 |
| Auto 1 | 213.74 | 213.74 | 0.00 | |
| Auto 2 | 332.74 | 332.74 | 0.00 | |
| Hair care | 45.00 | 93.00 | 48.00 | |
| School/work lunch | 60.00 | 60.00 | 0.00 | |
| Pets | 6.00 | 6.00 | 6.00 | |
| Joint GM Credit Card | 0.00 | 100.00 | 100.00 | |

---

10.  This expense is comprised of services provided by SBC and Verizon Wireless.

11.  This amount represents the figure stated in the copy of the account billing statement from Michigan Farm Bureau Family of Companies contained in Debtor's Ex. 20.  It differs from the amount stated in Debtor's Ex. 19, which consists of an itemization of her current monthly expenses.  In response to paragraph 11 for auto insurance, the figure of $336.21 is stated in Debtor's Ex. 19.

| Tobacco | 44.00 | 44.00 | 0.00 |
|---|---|---|---|
| TOTAL | $ 4,350.37 | $ 5,461.22 | |

Subsequent to Debtor's bankruptcy filing, her expenses overall have increased by some $1,100. At trial, Debtor explained the changes that have occurred in some of her expenses. First, she testified that her husband took out a home equity loan of $30,000, which is in his name only. According to Debtor, this loan was taken out to pay off outstanding joint credit card debts not extinguished by her discharge. At the same time, Debtor stated that a small balance remains on the joint GM credit card. Second, the substantial increase in auto insurance occurred because Debtor's youngest daughter, Ashley, turned 16. Debtor testified that she had to choose to "revoke" Ashley's license or put her on the insurance. She put her on their insurance policy and the cost increased by approximately $220.00. Third, the increase in transportation expense occurred due the price of gas and the fact that her husband's daily commute to and from work is about 140 miles.

There are inconsistencies in Debtor's representations and testimony about her husband's income. In her bankruptcy petition, Debtor represented on her Schedule I that her husband's monthly gross income as $4,532.67 and net income as $3,331.30. This results in an amount of $54,292.04 as her husband's gross annual income. In her Statement of Financial Affairs, she indicated that his annual salary for 2002 as $75,014; 2003 as $82,342; and 2004 year to date as $59,074.36. During her deposition, Debtor testified that her husband's annual income was approximately $70,000. (Plf.'s Ex. A and Def.'s Ex. 22 at 8.). At trial, Debtor testified that she "imagined" that her husband earned around $80,000 annually. Yet, this testimony is contradicted by her own exhibit 19, which is supposed to be a statement of current income as of February 22, 2006. In this exhibit, Debtor indicates her husband's monthly gross income as $5,200.00, which results in an annual income of $62,400. No other independent evidence was introduced to corroborate Debtor's representations about her husband's income. She did not offer copies of his pay stubs, their joint checking and savings accounts statements, or any tax returns.

In addition, Debtor did not testify about any changes that may have occurred in her

husband's employment status. Debtor did not explain the alleged decline in her husband's income even though prior years indicate that his annual salary has increased each year. She did not represent that he was no longer working overtime or had been laid off for an extended period of time. In fact, when questioned by her own attorney, Debtor testified that while her husband was scheduled to be laid off for one week possibly two weeks, she was pretty sure he would be called back to work and that he is not unemployed for a specific period of time. Debtor did not offer any testimony about the likelihood of her husband's employment being in jeopardy except to the limited extent concerning her testimony about his eligibility for retirement in two years. So, it appears that her husband's job is secure and no evidence was presented suggesting GM might cutback on his services in the foreseeable future.

Although on paper, it looks like Debtor's expenses exceed their income, she did not testify or offer any evidence about their inability to make ends meet or that they were unable to pay certain debts. There is nothing to indicate that Debtor or her husband have fallen behind in their bills. It actually appears that the exact opposite has occurred and the parties have the necessary income to afford to pay the increases that have occurred in their expenses subsequent to her bankruptcy filing.

The Court also finds that if Debtor and other family members engaged in a certain degree of belt-tightening, reasonable budgeting, and more conservative living certain expenses could be decreased. These categories include: telephone, cable, home repairs, food, clothing, transportation, recreation, auto insurance, and the joint GM credit card. While none of these items on an individual basis are "luxury" items, the inquiry in this situation is whether the costs associated with these expenses are "reasonably necessary." Expenses that are "reasonably necessary" for such support are considered when calculating ability to pay a debt incurred in a divorce decree or property settlement. *In re Hammermeister*, 270 B.R. 863 (Bankr. S.D. Ohio 2001). "Reasonably necessary expenses are those that are adequate, not first class or luxury items." *Id.* (*citing In re Brooks*, 241 B.R. 184, 186 (Bankr. S.D. Ohio 1999) and *Nelson v. Easley* (*In re Easley*), 72 B.R. 948, 949 (Bankr. M.D. Tenn. 1987)). "A debtor although not expected to live in poverty, is expected to tighten [her] financial belt, and thus do without many amenities to which [she] may have otherwise become accustomed." *In re Stoodt*, 302 B.R. at

-21-

557.

No evidence was presented to persuade the Court that the costs associated with any of these expenses are "reasonably necessary" within the meaning of Section 523(a)(15)(A). A downward adjustment of these expenses is appropriate and the Court finds that the following costs of these expenses are reasonable for purposes of Section 523(a)(15)(A): telephone: $100.00; cable $60.00; home repairs: $50.00; food: $425.00; clothing: $100.00; transportation: $375.00; recreation: $50.00; auto insurance: $350.00; and joint GM credit card: $50.00. Based on the revised figures of these expenses, the Court finds that Debtor could possibly generate monthly disposable income of more than $700.00. After considering the occurrence of unexpected expenses, it seems reasonable for Debtor to allocate $375.00 toward the repayment of the Debt. If Debtor were to faithfully maintain these monthly payments on the Debt, it could be extinguished in less than five years.

The Court is also mindful of the other "ability to pay" factors and considers them as follows:

1. *The presence of more lucrative employment opportunities which might enable the debtor to fully satisfy her divorce-related obligation*:

At trial, Debtor testified that she cannot work full-time because she suffers from panic attacks. She explained that she has had them since she was 19 years old. Debtor stated that she attends counseling to the extent permitted by her insurance and takes medication to alleviate her anxiety symptoms. Despite this testimony, Debtor presented a different outlook on her employment possibilities during her deposition. (Plf.'s Ex. E and Def.'s Ex. 22 at 21.) On November 29, 2005, she testified that she had recently applied for a position with the United States Postal Service. She explained that she had passed the "test" and had been placed on a two year waiting list. (*Id.*) Although no other testimony or evidence was introduced at trial regarding her hours of such employment or the possible salary she could earn through this employment, the Court observes that it is highly probable that her salary could exceed her current annual income of $7,800.00, exclusive of child support.

2. *The extent to which the debtor's burden of debt will be lessened in the near term*:

In her Schedule F, Debtor represented the total amount of her unsecured debts as

-22-

$41,954.23.  This amount includes the Debt at issue in the amount stated by Debtor of $16,593.23.  Her unsecured debt also includes joint charge account obligations with her husband to Citi Cards of $9,251.00 and Household Credit Services of $11,324.00.  Debtor's discharge eliminated her personal liability associated with these joint obligations as well as her individual charge account with First USA in the amount of $4,381.00 along with a minimal medical debt of $405.00.  As a result of her bankruptcy, Debtor has received a discharge of approximately $25,361.00.  But due to the home equity loan allegedly obtained by her husband with regard to the joint charge accounts, Debtor remains "burdened" by these debts for two reasons.  First, the monthly payment of the home equity loan diminishes the amount of disposable income available for use.  Second, the home equity loan now encumbers Debtor's interest in her residence.

       3.      *The extent of debtor's good faith efforts to satisfy the debt in question*:

The record does not contain any evidence to indicate that Debtor made any effort to pay the Debt.  Instead, the evidence indicates that instead of choosing to engage in any attempts to pay the Debt, Debtor simply chose to file bankruptcy.

       4.      *The amount of the debt creditor is seeking to have declared nondischargeable*:

The amount of the Debt at issue is $13,944.95, exclusive of interest.

       5.      *The value and nature of any property the debtor retained after her bankruptcy filing*:

Subsequent to her bankruptcy filing, Debtor retained a home and personal property consisting of a 2003 Grand Prix, which is a lease vehicle that Debtor along with her husband intend to purchase, a 2004 Pontiac Sunfire, which Debtor and her husband are in the process of purchasing, household goods, furnishings, jewelry, and sports equipment jointly owned with her spouse valued in excess of $21,000.50.  *See* Def.'s Sch. A, B, and C.  Debtor has health, dental, vision, and life insurance.  She did not know the value of her life insurance policy.  At the time of trial, the balance in their joint savings account was approximately $1,000.

Debtor does not have a pension or a 401(k) herself.  But she did testify that her husband had a pension but she did not know the value of his pension.  Debtor also testified that her husband "might" have GM stock and a mutual fund, but she did not know the values of these assets as well.  The Court notes it is highly likely that she has an interest in her husband's

-23-

pension and other financial assets. Unfortunately, the extent of the evidence in the record limits the Court's ability to state the specific value of Debtor's interest in these assets.

6.     *Any evidence of probable changes in debtor's expenses*:

Beyond the increases that have occurred in Debtor's expenses post-petition, no additional evidence was submitted about the likelihood of Debtor's expenses increasing or decreasing in the near future.

The Court also has one final observation with regard to the requirements of § 523(a)(15)(A). Pursuant to its express language, a court must also take into consideration the amount of property the debtor may rely on to pay the marital debt. *Biederman v. Stoodt* (*In re Stoodt*), 302 B.R. 549, 557 (Bankr. N.D. Ohio 2003) (pointing out that Section 523(a)(15)(A) "does not permit a debtor to deplete their assets to the detriment of his or her marital obligations."); *Courtney v. Traut* (*In re Traut*), 282 B.R. 863, 870 (Bankr. N.D. Ohio 2002) (observing that there was no justifiable reason for debtor's failure to pay his marital obligation since he had a sufficient resource available to do so once he received an $18,000 distribution from a pension plan).

Debtor has taken inconsistent positions about the extent of her interest in the home she lives in with her husband. In her Schedule A, Debtor represented that she had a "fee simple" interest in real property located at 8333 Bonnie Court, Grand Blanc, Michigan. She estimated that this residence had a fair market value of $235,000 less 10% for costs of sale to arrive at a net value of $211,500. She disclosed that the residence was encumbered by a mortgage of $182,449, which she claimed she was obligated on. Debtor estimated the value of her interest in the residence as $105,750. During her deposition, in response to a question posed to her about the ownership of the home, Debtor represented that "Donald and I both own it." (Plf.'s Ex. E and Def.'s Ex. 22 at 5.)

But at trial, Debtor testified that she was not certain about her ownership interest in this residence. She testified that her husband bought the house in August 2002 and she's not sure if her name is on the house. She explained that her interest in the home "may be a bar of dower type." Debtor failed to provide any independent evidence in the form of copies of a quit claim deed or warranty deed to verify title to the home.

-24-

She further explained during the trial that subsequent to her bankruptcy filing, her husband took out a home equity loan of $30,000[12] to pay off outstanding joint charge accounts not extinguished by her discharge. Debtor did not offer any testimony to explain why her husband thought it was necessary to take this action. No independent evidence concerning the home equity loan was presented to the Court. One possible explanation is that the home equity loan was obtained in order to prevent the Court from determining that Debtor possessed equity in an asset that she could use as a resource to pay the Debt to Mr. Dempsey. Another explanation is that this action was taken by Debtor's husband to simply consolidate legitimate debts. Regardless, it is very disconcerting to the Court that Debtor chose to completely disregard payment of the Debt to Mr. Dempsey.

Based on the totality of the evidence, the Court finds that Debtor failed to meet her burden of proof. The Court concludes that Debtor has the ability to pay the Debt and is not entitled to discharge the debt pursuant to § 523(a)(15)(A). The Court's analysis does not end but must continue in light of Debtor's reliance on the balancing test of § 523(a)(15)(B).

2.    Debtor failed to meet her burden of proof under § 523(a)(15)(B)

Debtor bore the burden of proving by a preponderance of the evidence that a discharge of the Debt would confer a benefit to her that outweighs any detrimental consequences to Mr. Dempsey. Based on the evidence in the record on this issue, the Court cannot find that Debtor met her burden of proof.

> [T]he best way to apply the 11 U.S.C. § 523(a)(15)(B) balancing test is to review the financial status of the debtor and the creditor and compare their relative standards of living to determine the true benefit of the debtor's possible discharge against any hardship the spouse, former spouse and/or children would suffer as a result of the debtor's discharge. If, after making this analysis, the debtor's standard of living will be greater than or approximately equal to the creditor's if the debt is not discharged, then the debt should be nondischargeable under the 523(a)(15)(B) test. However, if the debtor's standard of living will fall materially below the creditor's standard of living if the debt is not discharged, then the debt should be discharged under 11 U.S.C. § 523(a)(15)(B).

---

12. The Court observes that a conflict exists between the amount of the home equity loan and the amount of the joint charge account obligations. In her Schedule F, Debtor represented that the total amount of the two joint charge accounts equaled $20,575.

*Hart v. Molino*, (*In re Molino*), 225 B.R. 904, 908-09 (B.A.P. 6th Cir. 1998) (*citing In re Smither*, 194 B.R. 102 (Bankr. W.D. Ky. 1996)).

"Essentially, the Court is asked to compare the respective standard of living of both parties and determine who will 'suffer more' if there is a discharge." *Simpson v. Simpson* (*In re Simpson*, 336 B.R. 739, 744 (Bankr. W.D. Ky. 2006) (*citing In re Smither*, 194 B.R. at 110).

To determine the parties' respective standards of living, the following non-exclusive list of eleven factors may be considered:

> 1.) The amount of debt involved, including all payment terms;
>
> 2.) The current income of the debtor, objecting creditor and their respective spouses;
>
> 3.) The current expenses of the debtor, objecting creditor and their respective spouses;
>
> 4.) The current assets, including exempt assets of the debtor, objecting creditor and their respective spouses;
>
> 5.) The current liabilities, excluding those discharged by the debtor's bankruptcy, of the debtor, objecting creditor and their respective spouses;
>
> 6.) The health, job skills, training, age and education of the debtor, objecting creditor and their respective spouses;
>
> 7.) The dependents of the debtor, objecting creditor and their respective spouses, their ages and any special needs which they may have;
>
> 8.) Any changes in the financial conditions of the debtor and the objecting creditor which may have occurred since the entry of the divorce decree;
>
> 9.) The amount of debt which has been or will be discharged in the debtor's bankruptcy;
>
> 10.) Whether the objecting creditor is eligible for relief under the Bankruptcy Code; and
>
> 11.) Whether the parties have acted in good faith in the filing of the bankruptcy and the litigation of the 11 U.S.C. § 523(a)(15) issues.

-26-

*In re Molino*, 225 B.R. at 908-09 (citing *Patterson v. Patterson*, (*In re Patterson*), No. 96-6374, 1997 WL 745501 (6th Cir. Nov. 24, 1997) (citing *In re Smither*, 194 B.R. 102 (Bankr. W.D. Ky. 1996)).[13]

Most of the necessary information pertaining to Debtor's financial situation is laid out in detail in the Court's analysis of § 523(a)(15)(A). The Court will now review Mr. Dempsey's income, expenses, assets, and liabilities.

Since 2001 to date, Mr. Dempsey has been the caretaker for his terminally ill nephews. Both nephews have Huntington's disease and their life expectancy is unknown. Mr. Dempsey explained that based on the doctor's predictions, his youngest nephew should have passed away by now. His work hours vary. Mr. Dempsey explained that he could be with his nephews 24 hours a day for a total of 40 to 45 days, other days he could be with them only 8 to 10 hours, and there are some days he does not see his nephews at all. Mr. Dempsey also testified that his nephews' mother was retired and that she received a pension from GM. (Plf.'s Ex. D at 9.) He did not know if she received social security or disability income (Plf.'s Ex. D at 10.) At trial, no further testimony was elicited from Mr. Dempsey as to the extent of care his sister provides to her sons or her inability to provide such care.

For the personal care services he renders, Mr. Dempsey currently receives net monthly income of $430.00 from the State of Michigan, which on an annual basis equals $5,160. He testified that he cannot obtain additional employment due to the care of nephews and his father, who is also ill. But Mr. Dempsey admitted that he could perform health care services for other individuals but he chooses to only care for his family right now. Mr. Dempsey also acknowledged that if he stopped helping his family, he could obtain other work. But he did not know how much he would earn from any other employment.

It is not completely clear to the Court how much income Mr. Dempsey earned in 2005 for providing personal care services. At the time of trial, Mr. Dempsey represented that he had not prepared his 2005 federal and state income tax returns. A "State of Michigan Remittance Advice" document indicates Mr. Dempsey received a gross amount of $385.78 less social

---

13. These factors, in essence, involve a totality of the circumstances analysis.

security of $23.91 and medicare $5.60 for a net amount of $356.27 in 2005 for the months of April, May, June, July, and September. (Plf.'s Ex. J.) Mr. Dempsey admitted that this would have been his only source of income. Based on this information, Mr. Dempsey's annual gross income for 2005 would seem to be $4,629.36.

Although not income, Mr. Dempsey admitted that he receives money in the form of "gifts" from his father. He could not state an exact amount of money his father gives him because it varies on a month-to-month basis. Mr. Dempsey did indicate these "gifts" range from as high as $700 per month to as low as $200 per month. He explained that his father's total monthly income is $4,000, which consists of Social Security and a VA pension.

Immediately prior to assisting his family members, Mr. Dempsey's employment consisted of selling new cars at Lasco Ford, Inc. (Plf.'s Ex. D at 10.) He received a weekly salary of $250 for a few months. His compensation would have changed to salary plus commission but he quit this employment to help care for his nephews and father. (Plf.'s Ex. D at 11.) Mr. Dempsey's 2002 Federal tax return indicates that he received a W-2 from Lasco Ford in the amount of $1,234.00. (Plf.'s Ex. I).

From approximately 1985 to 2001, Mr. Dempsey was Vice President and a 10% owner of Dempsey Micrographics, Inc. The services provided by this company consisted of scanning, data entry, and mailing for its clients, which included General Motors. Mr. Dempsey's duties consisted of sales and the management of all the employees. The other owner in this business was Mr. Dempsey's mother, Margaret Cuvrell. This business ceased operating in 2000. Mr. Dempsey testified that advanced technology and the loss of several contracts forced the closure of the business. As part of the winding down of Dempsey Micrographics, Mr. Dempsey started doing business as Dempsey & Associates also sometime in 2001. This d/b/a "outsourced data entry" for its clients MSX International and Blue Cross Blue Shield of Michigan. Mr. Dempsey's goal was to maintain these existing contracts through Dempsey & Associates. He never met this goal because he lost the contract with Blue Cross Blue Shield. The life span of this business was approximately one year.

Mr. Dempsey's Federal and State income tax returns indicate that he reported gross income for the years 2004 as $16,440; 2003 equaled $24,104; 2002 equaled $17,199 and 2001

-28-

equaled $104,898. (Plf.'s Ex. I.)

Mr. Dempsey has no assets in the nature of bank accounts, stocks, bonds, IRA, or annuities. At trial, Mr. Dempsey disclosed that his name is on his father's bank account to enable him to pay his father's bills. He stated that none of the money in his father's account is his and he estimated the account balance to be $30,000 to $40,000.

Mr. Dempsey's health is good. He has a health insurance plan provided by Genesee County, which is based on his lower income. Mr. Dempsey owns a 1998 Blazer, which was paid off sometime in 2005. He did not explain how he was able to pay off the debt for this vehicle. Mr. Dempsey estimated the total value of his assets as $21,650, which consists of the Debt Debtor owes him, $4,650 Kelley Blue Book value for his 1998 Blazer and about $1,000 for used clothing and furniture. (Plf.'s Ex. G.) He also owns a 1955 Cadillac, which was his grandfather's vehicle. (Plf.'s Ex. D at 25.) Mr. Dempsey testified that it was in terrible shape and he estimated that it was worth $1,000. (*Id.*)

As to his expenses, Mr. Dempsey testified that he does not actually spend any money on his day-to-day living expenses. Although Mr. Dempsey lives with his father he does not pay any rent or any other expenses to his father. His father supplies most of the food. He represented that his monthly expenses consist of $100 for car insurance, $260 in child support, $100-$150 for gas and car repairs and $15 for a haircut. Mr. Dempsey also stated that he takes his kids out to eat once in a while but he did not provide the cost of this expense. Mr. Dempsey does not maintain any renter's, health, life, or accidental insurance policies. His monthly expenses are approximately $525.00. Mr. Dempsey's liabilities consist of $31,287 in credit card debts, $16,000 for legal fees, $2,000 for accounting fees, $115,000 for federal and state taxes[14] and

---

14. As of June 17, 2004, the balance of delinquent 1040 taxes to Internal Revenue Service for the tax year 2000 equaled $3,336.66. Additional penalty and interest for late payment continues to accrue. As of June 17, 2004, the balance of delinquent 1040 taxes to the Internal Revenue Service for the tax year 2001 equaled $50,076.31. Additional penalty and interest for late payment continues to accrue. Mr. Dempsey also owes the Internal Revenue Service an additional sum of $44,446.66. This sum represents civil penalties for period of 3-31-2000 of $18,858.22 and $25,588.24 for the period 6-30-2000. It appears that this sum consists of a trust fund penalty incurred in relation to Dempsey Micrographics. (Def.'s Ex. 27.) It is not clear how much of this obligation is solely Mr. Dempsey's responsibility.

other miscellaneous debt of $500.00, which equals $164,437. (Plf.'s Ex. G.) Mr. Dempsey has never entered into a payment plan with the IRS for his delinquent taxes. He does not have the use of any credit cards because all of them are in default. There are no pending lawsuits but he does receive numerous collection letters.

Mr. Dempsey also acknowledged that he takes vacations on an annual basis. He explained that he "tries to get away from the stress of family" at least twice a year. Mr. Dempsey stated that he travels to Florida and the duration of a trip is about 16 days. He explained that he stays in a hotel but that the costs of these vacations are not paid by him but instead by a friend.

The evidence before the Court makes its analysis and application of § 523(a)(15)(B) extremely difficult. It is obvious that both Plaintiff and Defendant's standard of livings are subsidized by family members. If the support provided by their family members were not considered, the parties' respective incomes indicate that Debtor now earns more than Mr. Dempsey. She represented that she earns approximately $7,800 by rendering personal care services, cleaning homes, and providing nail care services. The Court notes that both parties earnings appear to have decreased since entry of the divorce decree, which indicates that they both had net income of approximately $250 per week.

The support Mr. Dempsey receives from his father is inconsistent and rather informal. Mr. Dempsey lives with his father in his home and yet pays him nothing for his share of any bills associated with the apartment or for groceries. According to Mr. Dempsey, their relationship developed this way because he assists his father. Yet, no evidence was presented about what Mr. Dempsey does to assist his father or why his father even needs assistance. If Mr. Dempsey's father ceased his support, he would have to find another place to live. Most likely this would mean that Mr. Dempsey would incur more expenses than he currently does. This in turn could lead to Mr. Dempsey having to find employment in order to earn money that adequately supports himself and enables him to meet his living expenses. Meanwhile, Debtor's husband provides a substantial amount of financial support to her and her daughter on a consistent basis. If her husband withdrew his support, Debtor would also have to find a way to earn the necessary money to support herself and her daughter.

-30-

When "comparing the parties' prospective standards of living, each party's projected income should be measured by his or her realistic earning potential, not by lifestyle or other choices which restrict income." *Findley v. Findley* (*In re Findley*), 245 B.R. 526, 532 (Bankr. N.D. Ohio 2000) (citation omitted). In this proceeding, Mr. Dempsey has voluntarily chosen to limit his income to the earnings he receives for the personal care services he renders to his nephews. He acknowledged that this was his choice based on his desire to help his family and his belief that he did not have any other time to dedicate to other employment. His decision while on the one hand could be commended; on the other it cannot be squared with the overall affect it is having on his obligations and responsibilities especially those to his youngest daughter, Ashley. The financial support he provides her is minimal. He pays only $260.00 a month in child support. Debtor and to large degree her husband meet Ashley's financial needs and maintain her health insurance. But the only evidence in the record for the Court to look to ascertain Mr. Dempsey's realistic earning potential is either five years old or involves incomplete information pertaining to personal care services. No evidence about any current employment opportunities relative to Mr. Dempsey's particular skills was presented by either party.

"The balancing test of § 523(a)(15)(B) is, at its heart, a test of fairness; thus, principles of equity of come into play." *Messenger v. Messenger*, (*In re Messenger*), 331 B.R. 733, 741 (Bankr. N.D. Ohio 2005). On balance though it is impossible for the Court to reach the conclusion that the benefit Debtor would receive if the Debt were discharged outweighs the detriment to Mr. Dempsey. If the Debt were discharged, she would benefit by having a greater amount of disposable income available for her use. Another benefit is that she would be able to walk away from the Debt after not making any effort to pay it and then compounding her lack of effort by depleting an interest in an asset that it appears she could have used to pay the Debt. Is it fair for the Court to use equity to condone such conduct? Yet, Mr. Dempsey's actions also cause the Court to pause and ponder what kind of detriment he would actually suffer if the Debt is discharged? He's in good health, intelligent, and has sales and management experience, which in the not to distant past enabled him to earn between $80,00 to $95,000. But in the name of helping his family, he has chosen to reduce his income to basically poverty level and relies on financial assistance from his 81 year old father to meet his day-to-day needs. All the while, this

-31-

prevents him from fully being able to adequately meet the needs of his own children and to address the more than $160,000 debt he is burdened with.  In conclusion, the Court determines it comes down to the fact that it was Debtor's burden to prove that the benefit of the discharge outweighed the detriment to Mr. Dempsey and she did not present the necessary evidence to tip the balance in her favor.  *Biederman v. Stoodt*, (*In re Stoodt*), 302 B.R. 549, 558 (Bankr. N.D. Ohio 2003) (pointing out that use of the word "outweigh" in Section 523(a)(15)(B) requires a debtor to show something that "tip[s] the balance in the debtor's favor").

VI. <u>Conclusion</u>

For the reasons stated above, the Court finds that the Debt is not in the nature of support and therefore is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(5).  However, the Court further finds that the Debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(15).  An order in accordance with this opinion is being entered contemporaneously.

Date:_____     _____

Signed on December 07, 2006

                          _____/s/ Walter Shapero_____
                          Walter Shapero
                          United States Bankruptcy Judge